UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN ADMIRALTY

In Re: Anchorage Yacht Basin, Inc.

ANCHORAGE YACHT BASIN,
INC.,

      Petitioner,

v.                                                          Case No: 6:24-cv-1305-JSS-DCI

MARCUS EDUARDO PEREZ, SR.,
MICHAEL N. MILLIMACI, and
STONE SPARKES,

      Respondents.

_____/

## **ORDER**

This admiralty case arises from a drowning incident that resulted in the death of Daniel Perez and spurred much litigation among the parties. Respondent Michael N. Millimaci moves for summary judgment, and the other parties in the case oppose the motion. (*See* Dkts. 87 to 88, 99, 102 to 105, 107 to 110, 138, 143.) Mr. Millimaci argues that the indemnity and hold harmless clauses in his rental agreement with Petitioner, Anchorage Yacht Basin, Inc., are unenforceable as contrary to public policy. (Dkt. 87 at 6–11.) Mr. Millimaci also asserts that Anchorage's breach of contract claim against him fails. (*Id.* at 16–19.) As to the negligence claims brought against him by Daniel Perez's father, Respondent Marcus Eduardo Perez, Sr., Mr.

Millimaci maintains that no duty was owed and that no evidence supports negligent entrustment.  (*Id.* at 11–15.)  To avoid confusion, the court refers to Daniel Perez as Mr. Perez and to his father as Mr. Perez, Sr.  Mr. Millimaci additionally contends that Anchorage and Respondent Stone Sparkes are not entitled to contribution or indemnity from him.  (*Id.* at 15.)  Upon consideration, for the reasons outlined below, the court denies Mr. Millimaci's motion.

## FACTS[1]

During the week of May 13, 2023, a group of college students including Mr. Millimaci, Mr. Sparkes, and Mr. Perez met in Melbourne, Florida, to celebrate the end of the school year.  (Dkt. 88 ¶¶ 1, 4; Dkt. 99 ¶¶ 1, 4; Dkt. 104 ¶¶ 1, 4; *see* Dkt. 88-1 at 3–6.)  The group stayed at a house belonging to family of Brandon Assam—a fraternity brother of Mr. Millimaci, Mr. Sparkes, and Mr. Perez.  (Dkt. 88 ¶¶ 2–4; Dkt. 99 ¶¶ 2–4; Dkt. 104 ¶¶ 2–4; *see* Dkt. 88-1 at 3–6.)  The group decided to go boating for the day of May 13, with Mr. Assam intending that he and his sister Karis Assam would use their credit cards as necessary for the boat rental.  (Dkt. 88 ¶¶ 3, 5–7; Dkt. 99 ¶¶ 3, 5–7; Dkt. 104 ¶¶ 3, 5–7; *see* Dkt. 88-1 at 8–9.)

Mr. and Ms. Assam had lived in Brevard County for years and had been on boats in the Indian River Lagoon numerous times.  (Dkt. 88 ¶ 13; Dkt. 99 ¶ 13; Dkt.

---

[1] In setting out the background facts, the court views the evidence in the light most favorable to the non-moving parties.  *See Underwood v. City of Bessemer*, 11 F.4th 1317, 1327 (11th Cir. 2021).  Where possible, the court derives the facts from the parties' stipulations (Dkts. 88, 99, 103, 104).  *See Jimenez v. Dep't of Homeland Sec.*, 119 F.4th 892, 900 (11th Cir. 2024) ("A party . . . may cite to a stipulation to establish that a fact is not disputed.").

104 ¶ 13; *see* Dkt. 88-1 at 8–9.)  Mr. Assam chose to rent a boat from Anchorage because he had done so before.  (Dkt. 88 ¶ 7; Dkt. 99 ¶ 7; Dkt. 104 ¶ 7; *see* Dkt. 88-1 at 8.)  Anchorage is in the marina business and is a livery, which means that it rents vessels to third parties.  (Dkt. 88 ¶ 8; Dkt. 99 ¶ 8; Dkt. 104 ¶ 8; *see* Dkt. 88-2 at 3, 5.) Florida law prohibits a livery from renting vessels unless the livery "[o]btains and carries in full force and effect a policy from a licensed insurance carrier in th[e] state which insures the livery against any accident, loss, injury, property damage, or other casualty caused by or resulting from the operation of the livery vessel."  Fla. Stat. § 327.54(7).  Despite this insurance requirement, it is undisputed that Anchorage did not have livery liability insurance in place on the day in question.  (Dkt. 88 ¶ 9; Dkt. 99 ¶ 9; Dkt. 104 ¶ 9; *see* Dkt. 88-2 at 5.)  Nonetheless, Mr. Millimaci and Anchorage dispute whether Anchorage should have known that it lacked livery liability insurance. Mr. Millimaci states that Anchorage merely assumed that it had insurance.  (Dkt. 88 ¶ 10.)  Anchorage claims that it "reasonably believed that it had all necessary insurance" because it "had verified with its insurance agent that such insurance was in place."  (Dkt. 104 ¶ 10.)  Further, deposition testimony supports that although Anchorage experienced "a gap in insurance," (Dkt. 105 at 13), Anchorage's insurance company is providing coverage related to the incident.  (Dkt. 88-2 at 25.)

Initially, the group of college students planned to fit on one boat, which Mr. Assam stated he would operate.  (Dkt. 88 ¶¶ 11, 14; Dkt. 99 ¶¶ 11, 14; Dkt. 104 ¶¶ 11, 14; Dkt. 88-1 at 11; Dkt. 88-3 at 7–8.)  The plan was for him to pick up the group on

the boat at a yacht club near Anchorage.  (Dkt. 88 ¶ 12; Dkt. 99 ¶ 12; Dkt. 104 ¶ 12; *see* Dkt. 88-3 at 7–8.)  Mr. Millimaci was not present when the first boat was rented.  (Dkt. 88 ¶ 15; Dkt. 99 ¶ 15; Dkt. 104 ¶ 15; *see* Dkt. 88-3 at 8.)  However, when the group questioned whether one boat would suffice for all the members of the group, Mr. and Ms. Assam began arguing with each other about her renting a second boat, and to end the argument, Mr. Millimaci offered to use his credit card for the second boat.  (Dkt. 88 ¶ 14; Dkt. 99 ¶ 14; Dkt. 104 ¶ 14; *see* Dkt. 88-1 at 11.)  A dispute exists as to whether Mr. Millimaci planned to be only a passenger on the second boat, with Mr. Millimaci claiming that he did, (Dkt. 88 ¶ 16), and Mr. Sparkes and Anchorage citing Mr. Millimaci's rental agreement with Anchorage to assert that he did not, (Dkt. 99 ¶ 16; Dkt. 104 ¶ 16; *see* Dkt. 104-6 at 2, 8).

Mr. Millimaci, Mr. Sparkes, Mr. Perez, and Ms. Assam used a rideshare service to return to Anchorage from the yacht club to rent a second boat.  (Dkt. 88 ¶ 17; Dkt. 99 ¶ 17; Dkt. 104 ¶ 17; *see* Dkt. 88-1 at 11.)  Because Mr. Sparkes had a good deal of boating experience, he offered to operate the second boat, and Mr. Assam agreed with this arrangement.  (Dkt. 88 ¶¶ 19, 27–28; Dkt. 99 ¶¶ 19, 27–28; Dkt. 103 at 2–3; Dkt. 104 ¶¶ 19, 27–28; *see* Dkt. 88-4 at 11, 29.)  It is undisputed that Mr. Sparkes maintained a valid Georgia boater's license as of 2016.  (Dkt. 88 ¶ 24; Dkt. 99 ¶ 24; Dkt. 103 at 3; Dkt. 104 ¶ 24.)  Mr. Millimaci and Mr. Perez, Sr. claim that Mr. Sparkes was the only individual present for the rental of the second boat who had a boating license.  (Dkt. 88 ¶ 19; Dkt. 103 at 2.)  Mr. Sparkes and Anchorage deny this claim based on lack of

knowledge.  (Dkt. 99 ¶ 19; Dkt. 104 ¶ 19.)  Mr. Sparkes testified that Anchorage did not confirm that he held a valid boating license.  (Dkt. 88-4 at 13.)  However, Anchorage represents that deposition testimony presented, but not yet transcribed when Anchorage filed its summary judgment response, contradicts Mr. Sparkes's testimony on this point.  (Dkt. 104 ¶ 25.)

All parties but Mr. Sparkes agree that when Mr. Millimaci offered his credit card for the second boat, Mr. Millimaci was not planning to operate the boat: he did not decide where either of the boats would go or how the boats would be operated. (Dkt. 88 ¶ 21; Dkt. 103 at 2; Dkt. 104 ¶ 21.)  In taking a contrary position, Mr. Sparkes cites Mr. Millimaci's rental agreement.  (Dkt. 99 ¶ 21; *see* Dkt. 104-6 at 2, 8.) Regardless of whether Mr. Millimaci expected to operate the boat, he undisputedly did not operate it.  (Dkt. 88 ¶ 32; Dkt. 99 ¶ 32; Dkt. 103 at 3; Dkt. 104 ¶ 32.)  Whereas Mr. Sparkes agreed to operate the boat, he testified that to his knowledge, he could not use a credit card to rent the boat because he was not yet twenty-one years old; he was only twenty years old.   (Dkt. 88-4 at 10.)   Mr. Millimaci's rental agreement corroborates this testimony, as it requires Mr. Millimaci to "provide evidence that [he] is at least twenty-one . . . years of age."  (Dkt. 104-6 at 1.)  Although Mr. Millimaci used his credit card for the rental, the others on the boat intended to share the cost. (Dkt. 88 ¶ 26; Dkt. 99 ¶ 26; Dkt. 104 ¶ 26; *see* Dkt. 88-3 at 10.)

Mr. Millimaci's rental agreement with Anchorage contains multiple indemnity and hold harmless clauses.  (Dkt. 104-6 at 2, 7.)  He discusses three clauses in the

statement of facts supporting his summary judgment motion.  (Dkt. 88 ¶ 34.)  The full

text of the first clause reads:

> [Mr. Millimaci] acknowledges [his] responsibility for the safe and proper
> operation of the [boat] and for the safety and welfare of other [boat]
> operators and persons.  It is agreed and understood by [Mr. Millimaci]
> that [Anchorage] shall not be held liable for damages, inconvenience[,]
> or time lost caused by accident, breakdown[,] or malfunction of the
> [boat].  [Mr. Millimaci] further agrees to indemnify and hold harmless
> [Anchorage] from[] and against any and all claims for loss of or damage
> to property or injury to persons (including death) resulting through the
> use, operation[,] or possession of the [boat].  [Mr. Millimaci] further
> agrees to hold [Anchorage] harmless should loss or damages occur to any
> of [his] personal property while carried in, or on, the [boat], including
> loss or damage caused by fire, water, theft[,] or any other cause
> whatsoever.

(Dkt. 104-6 at 2 (emphasis omitted).)  As relevant here, the second clause states:

> [Mr. Millimaci] expressly agrees to indemnify and hold [Anchorage]
> harmless of, from, and against any and all loss, costs, damages, attorney
> fees[,] and/or liability in connection with the enforcing of the foregoing
> rental contract by [Anchorage], including expenses incurred in collection
> or attempting to collect delinquent rent and in the event of suit by
> [Anchorage] to recover possession of the [boat] and/or to enforce any of
> the terms, conditions[,] and/or clauses hereof.

(*Id.*)  The third clause, titled Liability to Third Parties, provides:

> [Mr. Millimaci] hereby agrees that [he] will indemnify and hold harmless
> [Anchorage] for all personal injuries, property damages, or any other
> damages to any and all third parties, including, but not limited to,
> operators and passengers of other watercraft and minor children under
> [his] custody, care, and control, as a result of any and all activities related
> to the rental, operation, or use of equipment provided by [Anchorage],
> even if such damages arise out of the negligence or fault of [Anchorage].

(*Id.* at 7.)

Under the rental agreement, Mr. Millimaci also "agree[d] not to use, nor permit

the use" of, the boat "in a careless or negligent manner." (Dkt. 104-6 at 4.) Mr. Sparkes signed a substantially similar rental agreement with Anchorage. (Dkt. 88 ¶ 35; Dkt. 99 ¶ 35; Dkt. 103 at 4; Dkt. 104 ¶ 35.) On occasions when either of two individuals may operate a boat or when one individual pays for a rental but another individual intends to operate the boat, Anchorage requires each of the two individuals to sign a rental agreement. (Dkt. 88 ¶ 36; Dkt. 99 ¶ 36; Dkt. 103 at 4; Dkt. 104 ¶ 36.)

The group of college students initially intended to boat to a sandbar in the Indian River Lagoon. (Dkt. 88 ¶ 40; Dkt. 99 ¶ 40; Dkt. 104 ¶ 40; *see* Dkt. 88-1 at 13.) Ms. Assam had visited the sandbar numerous times before. (Dkt. 88 ¶ 40; Dkt. 99 ¶ 40; Dkt. 104 ¶ 40; *see* Dkt. 88-1 at 13.) However, the group ultimately decided not to travel the distance to the sandbar for reasons including the return time for the boats. (Dkt. 88 ¶ 43; Dkt. 99 ¶ 43; Dkt. 104 ¶ 43; *see* Dkt. 88-1 at 15–16.) Ms. Assam testified that Mr. Sparkes stopped the engine of the second boat while the group considered what to do. (Dkt. 88-1 at 16.) Mr. Perez then asked her if he could go in the water, and she said yes. (Dkt. 88 ¶ 45; Dkt. 99 ¶ 45; Dkt. 104 ¶ 45; *see* Dkt. 88-1 at 16–17.) He was the first individual on the boat to get in the water. (Dkt. 88 ¶ 46; Dkt. 99 ¶ 46; Dkt. 104 ¶ 46; *see* Dkt. 88-1 at 25.) He went in by doing a backflip off the boat. (Dkt. 88 ¶ 46; Dkt. 99 ¶ 46; Dkt. 104 ¶ 46; *see* Dkt. 88-1 at 25.) He did not ask for a life vest or for help swimming. (Dkt. 88 ¶ 47; Dkt. 99 ¶ 47; Dkt. 104 ¶ 47; *see* Dkt. 88-1 at 33–34.) He went swimming with friends from the boat and did not wear a flotation device. (Dkt. 88 ¶ 47; Dkt. 99 ¶ 47; Dkt. 104 ¶ 47; *see* Dkt. 88-1 at 25, 33–34.) A dispute exists

regarding the calmness of the water at this time.  For example, according to Ms. Assam, the water was not "completely calm" given the wind.  (Dkt. 88-1 at 24.) However, Mr. Sparkes testified that the water was calm, that the wind was merely a light breeze, and that the surface of the water appeared smooth.  (Dkt. 88-4 at 21.)

When it was time to leave the area, Mr. Perez was told to swim back to the boat. (Dkt. 88-1 at 17; Dkt. 88-3 at 20; Dkt. 88-4 at 22.)  He responded that he could not swim back.  (*See* Dkt. 88-1 at 18; *but see* Dkt. 88-3 at 19 (Mr. Millimaci's deposition testimony that he could not remember whether Mr. Perez responded).)  Mr. Sparkes could not start the boat's engine, (Dkt. 88 ¶ 53; Dkt. 99 ¶ 53; Dkt. 103 at 5; Dkt. 104 ¶ 53), though not necessarily due to a mechanical failure, (*see, e.g.*, Dkt. 88-2 at 7–8, 19 (deposition testimony from an Anchorage employee concerning the regular inspection and maintenance of the boat)).  The extent to which Mr. Sparkes's negligence affected the failure to start the engine is a disputed issue.  (*See, e.g.*, Dkt. 105 at 16–17 ("[Mr.] Millimaci's observation of [Mr. Sparkes's] difficulty starting the [boat] after [the friends] had embarked on their journey for the day raises a question of fact which must be submitted to the jury [as to] whether [Mr.] Millimaci knew, based on [Mr. Sparkes's] conduct that day in operating the boat, [that Mr. Sparkes's] continued operation of the [boat] would be careless or negligent . . . .").)

Individuals on the boat looked for life vests and flotation devices to help bring Mr. Perez onto the boat.  (Dkt. 88 ¶ 53; Dkt. 99 ¶ 53; Dkt. 103 at 5; Dkt. 104 ¶ 53.) Mr. Sparkes got the engine to start, steered the boat to him, and jumped in the water

to assist him.  (Dkt. 88 ¶¶ 54–55; Dkt. 99 ¶¶ 54–55; Dkt. 103 at 5; Dkt. 104 ¶¶ 54–55; *see* Dkt. 88-1 at 19; Dkt. 88-4 at 26.)  Mr. Perez was pulled onto the boat but was unresponsive.  (Dkt. 88 ¶ 56; Dkt. 99 ¶ 56; Dkt. 104 ¶ 56; *see* Dkt. 88-1 at 20.)  Someone on the boat called 9-1-1, and the boat docked at the nearest opportunity, which happened to be a residential pier.  (Dkt. 88 ¶ 57; Dkt. 99 ¶ 57; Dkt. 104 ¶ 57; *see* Dkt. 88-1 at 20.)  Mr. Perez did not regain consciousness.  (Dkt. 88 ¶ 58; Dkt. 99 ¶ 58; Dkt. 103 at 6; Dkt. 104 ¶ 58.)  He was declared dead on arrival at the Holmes Regional Medical Center.  (Dkt. 88 ¶ 58; Dkt. 99 ¶ 58; Dkt. 103 at 6; Dkt. 104 ¶ 58.)  The autopsy report identifies accidental drowning as the cause of his death.  (Dkt. 88 ¶ 59; Dkt. 99 ¶ 59; Dkt. 103 at 6; Dkt. 104 ¶ 59; *see* Dkt. 88-6 at 1.)

## PROCEDURAL HISTORY

In July 2024, Anchorage initiated this case by petitioning for exoneration and limitation of liability as to the drowning incident pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501–30530.  (Dkt. 1.)  Mr. Millimaci, Mr. Perez, Sr., and Mr. Sparkes responded in opposition to Anchorage's petition and asserted affirmative defenses and claims against Anchorage.  (Dkts. 14, 24, 68.)  Mr. Millimaci sues Anchorage for common-law indemnity and contribution, (Dkt. 14 at 6–10), claiming that he "is without fault" because "the acts or omissions of Mr. Perez and [Anchorage] were the sole and proximate causes" of the incident, (*id.* at 9).  Mr. Perez, Sr. sues Anchorage for negligence and negligent entrustment under Florida law and general maritime law.  (Dkt. 68.)  Mr. Sparkes asserts three causes of action against

Anchorage: indemnity and contribution, breach of contract, and negligence. (Dkt. 24 at 10–17.)

In September 2024, Anchorage answered Respondents' allegations, denying liability, raising affirmative defenses, and countersuing Mr. Millimaci and Mr. Sparkes for indemnity, contribution, and breach of contract. (Dkts. 21, 22, 23.) Anchorage bases its indemnity claims on the indemnity and hold harmless clauses in its rental agreements with Mr. Millimaci and Mr. Sparkes. (Dkt. 22 at 12; Dkt. 23 at 16.) As to its contract claims, Anchorage alleges that Mr. Millimaci and Mr. Sparkes are liable for five breaches: (1) "representing [that they] did not need additional information or instruction in [the boat's] operation . . . from [Anchorage] after [they were] shown and instructed in [the boat's] operation . . . and the [b]oating [s]afety [r]ules," (2) overloading the boat, (3) using the boat "under the influence of liquor and . . . narcotics" or permitting such use of the boat, (4) using the boat "in a careless or negligent manner" or permitting such use of the boat, and (5) permitting the boat to be used by non-signatories to the rental agreements and by unqualified persons. (Dkt. 22 at 15–16; Dkt. 23 at 19–20.)

In October 2024, Mr. Sparkes initiated a separate limitation of liability action arising out of the drowning incident. (Dkt. 1, in case no: 6:24-cv-1863-JSS-DCI.) Mr. Millimaci, Mr. Perez, Sr., and Anchorage responded in opposition to Mr. Sparkes's petition with affirmative defenses and claims. (Dkts. 29, 30, 32, in case no: 6:24-cv-1863-JSS-DCI.) Mr. Millimaci asserts that he "is without fault" because "the acts or

omissions of Mr. Perez, Anchorage[, and Mr. Sparkes] were the sole and proximate causes" of the incident. (Dkt. 29 at 9, in case no: 6:24-cv-1863-JSS-DCI.) Mr. Perez, Sr. sues Mr. Sparkes under Florida law and general maritime law for personal injury and damages resulting from Mr. Sparkes's alleged negligence in operating the boat. (Dkt. 30 at 9–16, in case no: 6:24-cv-1863-JSS-DCI.) Anchorage reasserts its indemnity, contribution, and breach of contract claims against Mr. Sparkes. (Dkt. 32 at 6–12, in case no: 6:24-cv-1863-JSS-DCI.)

In January 2025, Mr. Perez, Sr. filed crossclaims against Mr. Millimaci in Mr. Sparkes's action. (Dkt. 34, in case no: 6:24-cv-1863-JSS-DCI.) Mr. Perez, Sr. sues Mr. Millimaci under Florida law and general maritime law for personal injury and damages because Mr. Millimaci purportedly failed to exercise reasonable care relating to the drowning incident. (*Id.* at 1–8.) Specifically, Mr. Perez, Sr. lists eight purported failures, or instances of negligence: (1) the failure "to properly ensure that the equipment, apparel[,] and appurtenances of the [boat] were in proper operating condition and were maintained in a proper operating condition during the recreational voyage," (2) the failure "to exercise reasonable care under the circumstances with respect to the operation [and] navigation" of the boat during the voyage, (3) the failure "to ensure that persons operating the [boat] had received instructions in proper procedure and operation" of the boat, (4) the failure to return the boat to Anchorage "when [Mr. Millimaci] discovered that [the boat] had an engine, parts[, or] equipment that failed," thereby "rendering [the boat] unseaworthy and unreasonably dangerous,"

- 11 -

(5) the failure "to deploy the anchor on the [boat] when [Mr. Millimaci] knew that . . . passengers, including [Mr.] Perez, were going to leave" the boat to swim, (6) the failure "to advise [or] require the passengers . . . to wear a personal floatation device . . . prior to leaving" the boat, (7) the failure "to attach lines to the [boat] so that swimmers . . . could hold onto and not drift away from" it, and (8) the failure "to throw floatation devices to [Mr.] Perez when" Mr. Millimaci knew that Mr. Perez was "struggling to stay afloat and beginning to drown." (*Id.* at 4–6.) In a separate crossclaim, Mr. Perez, Sr. alleges that Mr. Millimaci negligently entrusted the boat to Mr. Sparkes. (*Id.* at 8–11.)

In February 2025, the court granted Mr. Sparkes's motion (Dkt. 71) to consolidate his action with this case and designated this case as the lead case. (Dkt. 72.) In September 2025, Mr. Millimaci filed the instant motion for summary judgment. (Dkt. 87.) Discovery closed on March 2, 2026, and the deadline for summary judgment motions expired on April 6, 2026. (Dkt. 119 at 1.) Mr. Sparkes timely filed a summary judgment motion on March 24, 2026. (Dkt. 121.) That motion remains pending. In April 2026, on Mr. Perez, Sr.'s motion (Dkt. 124), the court permitted him to supplement his response to Mr. Millimaci's summary judgment motion and permitted Mr. Millimaci to supplement the corresponding summary judgment reply. (Dkt. 136; *see* Dkts. 138, 143.) Mr. Millimaci's motion is now ripe for resolution.

**APPLICABLE STANDARDS**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a party "assert[s] that a fact cannot be or is genuinely disputed," the party "must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . [by] showing that the materials cited do not establish the absence or presence of a genuine dispute[] or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials" when resolving the motion. Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that no evidence supports the non-moving party's case, the burden shifts to the non-moving party to show that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*,

- 13 -

461 F.3d 1315, 1320 (11th Cir. 2006).

To meet its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))). In deciding whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

## ANALYSIS

Mr. Millimaci advances arguments involving four topics: the enforceability of the indemnity and hold harmless clauses in his rental agreement, Anchorage's breach of contract claim against him, Mr. Perez, Sr.'s negligence claims against him, and the contribution and indemnity claims that Anchorage and Mr. Sparkes levy against him.

- 14 -

The court addresses these topics in turn.

### A. The Indemnity and Hold Harmless Clauses

"[T]he substantive law applicable to this action, which involves an alleged tort committed aboard a ship sailing in navigable waters, is the general maritime law, the rules of which are developed by the federal courts." *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1320 (11th Cir. 1989); *see Beckman v. Rick's Watercraft Rentals*, 719 So. 2d 1025, 1026 (Fla. Dist. Ct. App. 1998) ("In the case of an incident on navigable waters, the issue of whether a maritime claim is involved turns on whether the accident involved a realistic potentially disruptive impact on maritime commerce. . . . [A]n accident . . . which causes a serious injury to an occupant of a seagoing craft—even if no other vessel is involved . . . —fully qualifies under this definition." (quotation omitted)). Although "[g]eneral maritime law is federal law," *Coastal Fuels Mktg. v. Fla. Express Shipping Co.*, 207 F.3d 1247, 1251 (11th Cir. 2000), "when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law," *id.*

Mr. Millimaci argues that the indemnity and hold harmless clauses in his rental agreement with Anchorage are unenforceable because Anchorage violated the requirement of livery liability insurance imposed by state law. (Dkt. 87 at 6–11.) *See* Fla. Stat. § 327.54(7). This argument relies on *Tassinari v. Key West Water Tours, LC*, No. 06-10116-CIV-MOORE/GARBER, 2007 WL 1879172, at *5 (S.D. Fla. June 27,

2007), in which a district court found a rental agreement's waiver and hold harmless clauses unenforceable based on a violation of section 327.54. *Tassinari* states:

> A clause in an agreement exempting a party from tort liability is unenforceable on grounds of public policy if the agreement would exempt a party from liability arising from that party's failure to comply with a safety statute, as the safety obligation created by the statute for such purpose is an obligation owed to the public at large and is not within the power of any private individual to waive.

*Id.* (alteration adopted and quotation omitted). Section 327.54 imposes various requirements on liveries. *See* Fla. Stat. § 327.54. *Tassinari* dealt with an instruction requirement, not an insurance requirement. Under the facts of *Tassinari*, section 327.54 was a safety statute because it set an educational standard for requisite "instruction in the safe handling of personal watercraft" to be rented. 2007 WL 1879172, at *3. The court in that case reasoned that if statutorily compliant instruction had been given, the accident at issue—a collision involving personal watercraft—might not have occurred, as "greater knowledge often gives a greater sense of control" over personal watercraft. *Id.* at *4. To the extent that deficient instruction contributed to the accident, the court explained, liability in the case arose from the statutory violation. *Id.* at *4–5. The court concluded that "[w]hile the release and waiver provisions . . . [we]re sufficient to release [the d]efendant from liability for ordinary negligence, the provisions [we]re invalid as against public policy when applied to liability arising from [the statutory] violation." *Id.* at *5.

This case is distinguishable from *Tassinari*. Unlike the deficient instruction in that case, Anchorage's technical noncompliance with the liability insurance

- 16 -

requirement in section 327.54 is not the violation of a safety statute. In this case, the statute does not create a "safety obligation . . . owed to the public at large." *See id.*; *see also Fox v. Sunset WaveRunner Tours, Inc.*, No. 15-10055-CIV, 2016 WL 4250401, at *9 (S.D. Fla. Aug. 9, 2016) ("If the instructions were insufficient, then . . . safety statutes were violated . . . ."). Further, as Anchorage asserts, the gap in insurance did not contribute to the drowning incident, and thus, liability does not arise from the statutory violation. *See Tassinari*, 2007 WL 1879172, at *5. (*See* Dkt. 105 at 14 ("[L]iability on the part of Anchorage . . . does not arise out of Anchorage's compliance or non[]compliance with [section 327.54]. It cannot be reasonably argued, and [Mr.] Millimaci makes no[] attempt to argue, that Anchorage's insurance coverage or lack thereof caused or contributed to the drowning of [Mr.] Perez.").) The court also agrees with Anchorage that "the public policy concerns underlying the *Tassinari* court's reasoning for invalidating exculpatory clauses" are alleviated in this case because Anchorage now "has the insurance intended under the statute" despite the gap on the day of the incident. (*Id.* at 13 ("Although[] Anchorage's insurance agent failed to procure the insurance requested . . . , the agent's insurance carrier is providing coverage to Anchorage.").) *See* Fla. Stat. § 327.54(7)(a) (indicating that the purpose of the insurance requirement is to protect "against any accident, loss, injury, property damage, or other casualty caused by or resulting from the operation of the livery vessel"). Key factual differences between this case and *Tassinari* require the court to reject Mr. Millimaci's argument. He is not entitled to summary judgment on the

ground that the indemnity and hold harmless clauses are unenforceable as contrary to public policy based on a violation of section 327.54. *See RSUI Indem. Co. v. Desai*, No. 8:13-cv-2629-T-30TGW, 2014 WL 4347821, at *5 n.5 (M.D. Fla. Sept. 2, 2014) (finding cases "readily distinguishable" in light of "significant differences" in the facts).

## B. Breach of Contract

"A breach of contract claim in the maritime context requires that the plaintiff 'prove (1) the terms of a maritime contract[,] (2) that the contract was breached[,] and (3) the reasonable value of the purported damages.'" *Goodloe Marine, Inc. v. Caillou Island Towing Co.*, 679 F. Supp. 3d 1356, 1371 (M.D. Fla. 2023) (quoting *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005)). In opposing Anchorage's breach of contract claim against him, Mr. Millimaci makes three arguments. (Dkt. 87 at 16–19.) First, he argues, none of the alleged contractual breaches were established in discovery. (*Id.* at 16–17.) Second, according to Mr. Millimaci, Anchorage cannot sue him for breach of contract because "Anchorage's breach of contract [claim] is really a negligence claim founded on a contract" and, under the independent tort doctrine, Anchorage "may not recover in tort for a contractual dispute unless the tort is independent of any breach of contract." (*Id.* at 17–18 (quoting *Von Kutzleben v. Jefferson Ins. Co.*, No. 24-21921-CIV, 2025 WL 1140693, at *3 (S.D. Fla. Mar. 31, 2025)).) Third, Mr. Millimaci repeats his argument about the indemnity and hold harmless clauses. (*Id.* at 19 ("[T]hose provisions are unenforceable for Anchorage's failure to procure insurance. Anchorage cannot use a

breach of contract claim to enforce . . . provisions . . . that are void as against public policy. The reasoning of [*Tassinari*] should preclude the breach of contract claim against [Mr.] Millimaci as well.").) The court rejects each argument. Having already explained why the third argument fails, the court addresses only the first and second arguments herein.

With respect to the first argument, Mr. Millimaci acknowledges that Anchorage bases one of his purported contractual breaches on his permitting the boat to be used in a careless or negligent manner. (*See id.* at 16.) He then asserts that he undisputedly "did not operate the [boat] in a careless or negligent manner"—because he did not operate it at all—and that other alleged breaches—relating to overloading the boat and to permitting Mr. Sparkes to operate the boat while intoxicated, for example—lack evidentiary support. (*See id.* at 17.) However, Mr. Millimaci does not discuss whether evidence in the record would allow a reasonable factfinder to conclude that he permitted Mr. Sparkes to operate the boat in a careless or negligent manner. (*See id.* at 16–17.) *See United States v. Holley*, 166 F.4th 139, 151 (11th Cir. 2026) ("The law in [the Eleventh] Circuit requires an argument to be raised *and developed* in an initial brief[; otherwise, the argument] is considered abandoned."). In response to Mr. Millimaci's motion, Anchorage focuses on this purported breach, (*see* Dkt. 104-6 at 4), and maintains that a genuine dispute of material fact precludes summary judgment because a reasonable factfinder could determine that Mr. Millimaci permitted Mr. Sparkes to operate the boat in a careless or negligent manner. (Dkt. 105 at 16–17.)

- 19 -

The court agrees with Anchorage.  In the light most favorable to the non-moving parties, Mr. Millimaci had a contractual obligation to prevent Mr. Sparkes from operating the boat in a careless or negligent manner, and Mr. Millimaci did not fulfill this obligation.  *See Goodloe Marine*, 679 F. Supp. 3d at 1373 (explaining that a factual dispute as to whether an obligation was fulfilled precluded summary judgment on a breach of contract claim in an admiralty case).

Evidence indicates that Mr. Sparkes operated the boat and ran into difficulty with the engine.  (*See, e.g.*, Dkt. 88 ¶ 53; Dkt. 99 ¶ 53; Dkt. 103 at 5; Dkt. 104 ¶ 53.) Evidence also supports that the boat was routinely inspected and received regular maintenance.  (*See, e.g.*, Dkt. 88-2 at 7–8, 19.)  From this evidence, a reasonable factfinder could determine that Mr. Sparkes's difficulties in operating the boat resulted from his own negligence rather than from a mechanical issue with the boat.  *See Roberson v. Seaspan Corp.*, 521 F. Supp. 3d 1325, 1328, 1330 (S.D. Ga. 2021) (denying summary judgment in a negligence case involving injuries allegedly suffered by a longshoreman due to broken equipment, and reasoning that competing evidence regarding whether human error or a defect in the equipment caused the equipment to break created a genuine dispute of material fact); *see also Carib Resorts, Inc. v. Watkins Underwriters at Lloyds, Syndicate No. 457*, No. 16-25024-CV- GRAHAM/SIMONTON, 2018 WL 8048755, at *13 (S.D. Fla. Mar. 20, 2018) (holding in a marine insurance case that evidence of regular "inspection and maintenance services on" a vessel precluded summary judgment against the vessel's owner).  Further, it is undisputed

that Mr. Millimaci spent time on the boat while Mr. Sparkes operated it, and thus, in the light most favorable to the non-moving parties, Mr. Millimaci had opportunities to observe Mr. Sparkes's operation of the boat. Just as a reasonable factfinder could conclude that Mr. Sparkes negligently operated the boat, a reasonable factfinder could conclude that Mr. Millimaci knew of this negligent operation and permitted it. *Cf. Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996) (stating in a limitation of liability action that "privity or knowledge is an element of the tort of negligent entrustment" (citing *Joyce v. Joyce*, 975 F.2d 379, 385 (7th Cir. 1992))); *Joyce*, 975 F.2d at 385 (explaining that a vessel's owner can be liable for negligent entrustment if the owner "knows or has reason to know that the person being entrusted is incapable of operating the vessel safely"); *Campbell v. Deering*, No. 6:24-cv-1566-JSS-RMN, 2026 WL 1309042, at *7 (M.D. Fla. May 13, 2026) (supporting that an individual's opportunities to observe an occurrence can evidence the individual's knowledge of the occurrence). Therefore, Mr. Millimaci is not entitled to summary judgment as to Anchorage's breach of contract claim based on his first argument.

With respect to the second argument, Mr. Millimaci has the independent tort doctrine backwards. He does not contend that Anchorage cannot bring tort claims against him because of his contract; rather, he maintains that Anchorage cannot assert a contract claim against him because the claim is really a tort claim. (*See* Dkt. 87 at 17–18.) The independent tort doctrine provides: "[A] party may seek tort damages 'if conduct occurs that establishes [that] a tort is distinguishable from or independent of

the breach of contract.'"  *Kaloe Shipping Co. v. Goltens Serv. Co.*, 778 F. Supp. 2d 1346, 1356 (S.D. Fla. 2011) (alteration adopted) (quoting *Jones v. Childers*, 18 F.3d 899, 904 (11th Cir. 1994)).  "It is a fundamental, long-standing common[-]law principle that a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract." *Island Travel & Tours, Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. Dist. Ct. App. 2020); *accord Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1501 (M.D. Fla. 1995) ("Tort damages are not recoverable under Florida law in a breach of contract action absent an accompanying independent tort.").  That said, Anchorage's breach of contract claim represents an attempt to recover in contract, not tort.  The "independent tort doctrine . . . serves to bar a tort claim," *Roop v. Prime Rate Premium Fin. Corp.*, 710 F. Supp. 3d 1165, 1175 (M.D. Fla. 2024) (quotation omitted), not a contract claim.  Under his contract with Anchorage, Mr. Millimaci agreed not to permit the boat to be used "in a careless or negligent manner." (Dkt. 104-6 at 4.)  A reasonable factfinder could conclude that he breached this obligation.  Mr. Millimaci is thus not entitled to summary judgment on Anchorage's breach of contract claim.

## C. Negligence

Mr. Millimaci asserts that Mr. Perez, Sr.'s negligence claims against him fail because Mr. Millimaci did not owe Mr. Perez a duty of reasonable care.  (Dkt. 87 at 11–15.)  Mr. Millimaci acknowledges that a vessel's operators and owners owe duties of reasonable care to the vessel's passengers.  (*Id.* at 11–12.)  *See Sorrels v. NCL (Bah.) Ltd.*, 796 F.3d 1275, 1279 (11th Cir. 2015) ("Under maritime law, the owner of a

[vessel] in navigable waters owes passengers a duty of reasonable care under the circumstances." (quotation omitted)). Mr. Millimaci claims that he did not owe a duty because he was not the operator or owner of the boat. (Dkt. 87 at 12 ("[Mr.] Millimaci was neither of these things on the day in question.").) However, Mr. Millimaci signed a rental agreement with Anchorage, and under the agreement, the group of friends to which he belonged took possession of the boat from Anchorage and commanded and navigated the boat as the group saw fit while he was present on the boat. (*See* Dkt. 104-6.) Mr. Millimaci states that he lacked "the ability to exercise control over the vessel at any time during the day of the incident," (Dkt. 87 at 12), but a reasonable factfinder could conclude otherwise. In the light most favorable to the non-moving parties, Mr. Millimaci was an owner pro hac vice of the boat during the incident, and thus, he may be liable for negligence related to the incident. *See Morris v. Paradise of Port Richey, Inc.*, No. 8:07-cv-845-T-27TBM, 2009 WL 103291, at *3 (M.D. Fla. Jan. 14, 2009) (explaining that when "possession, command, and navigation of [a] vessel" is transferred to an individual through an agreement, the individual is "the owner pro hac vice of the vessel during the term of the . . . agreement" and "is liable for any injuries or damages to third parties" (quotation omitted) (citing *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993))).

Mr. Millimaci also argues that "no evidence establish[es his] negligent entrustment of the boat . . . to [Mr.] Sparkes." (Dkt. 87 at 15.) However, as discussed above with regard to breach of contract, a reasonable factfinder could conclude that

Mr. Millimaci permitted Mr. Sparkes to operate the boat in a negligent manner, as the boat's history of maintenance supports Mr. Sparkes's negligent operation of the boat, *see Roberson*, 521 F. Supp. 3d at 1328, 1330; *Carib Resorts*, 2018 WL 8048755, at *13, and Mr. Millimaci's presence on the boat at the time allowed Mr. Millimaci to observe Mr. Sparkes's operation of the boat, *see Suzuki*, 86 F.3d at 1064; *Joyce*, 975 F.2d at 385; *Campbell*, 2026 WL 1309042, at *7.  In fact, because only Mr. Millimaci and Mr. Sparkes signed rental agreements for the boat with respect to the incident, a reasonable factfinder could determine that in light of Mr. Millimaci's status as the only owner pro hac vice on the boat besides Mr. Sparkes, no other individual was better positioned to prevent Mr. Sparkes from negligently operating the boat.  Consequently, Mr. Millimaci is not entitled to summary judgment as to the negligence claims.

### D. Contribution and Indemnity

Mr. Millimaci maintains that neither Anchorage nor Mr. Sparkes is entitled to contribution or indemnity from him because, for reasons stated elsewhere in his motion, he was not negligent.  (Dkt. 87 at 15.)  The court has explained that a reasonable factfinder could find Mr. Millimaci negligent with respect to the drowning incident.  As a result, Mr. Millimaci is not entitled to summary judgment on the contribution and indemnity claims against him.  *See Great Lakes Dredge & Dock Co. v. Miller*, 957 F.2d 1575, 1584 (11th Cir. 1992) ("[L]iability in maritime actions should be distributed according to the parties' comparative degrees of fault."); *see also Murphy v. Airway Air Charter, Inc.*, No. 24-13811, 2026 WL 125793, at *7 (11th Cir. Jan. 16,

2026) (noting that this "rule is not mutually exclusive with joint and several liability").

## CONCLUSION

Accordingly, in light of the above, Mr. Millimaci's motion for summary judgment (Dkt. 87) is **DENIED**.

**ORDERED** in Orlando, Florida, on June 22, 2026.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record